Casey, C. J.,
delivered the opinion of the court:
The claimant named, and a large number of other individuals, and of various firms, bring this suit jointly. They set forth as the ground of their claim, and upon which they base their right to recover, that one Elie Cote, late of the city of Charleston, South Carolina, in 1865 was the owner of 75 bales of upland cotton ; that upon the capture of Charleston by the forces of the United States in February, 1865, the cotton was seized by the officers of the United States army, and shipped to the treasury agent at New York; and that the cotton was sold by him, and the net proceeds paid into the treasury of the United States; that on or about the 6th of May, 1865, Cotd, by an instrument of writing, duly executed and set forth, and a copy thereof annexed to the petition and made part of the case, assigned and transferred all his interest in the said cotton, and the proceeds thereof, to the claimants, for the payment of certain debts due by said Ooté to them respectively.
To this petitiou the Solicitor for the United States demurs, and, upon the argument, assigns for cause of demurrer that this being at the time of the assignment a claim against the United States, its transfer in the mode attempted is prohibited by the first section of the act February 26, 1853, (10 Stat., 17,) entitled “An act to prevent frauds upon the treasury of the United States.” That section isas follows: “That all transfers and assignments hereafter made of any claim upon the United States, or any part or share thereof, or any interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities, for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void unless the same shall be freely made and executed in the presence of at least two attesting witnesses after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof:” So the act of July 29, 1846, (9 Stat., 41,) enacts, “ that whenever a claim on the United States aforesaid shall hereafter have been allowed by a resolution or act of Congress, and thereby directed to be paid, the money shall not, nor shall any part thereof, be paid to any person or persons other than the claimant or claimants, his or their executor or executors, administrator *66 or administrators, unless such person or persons shall produce to the proper disbursing officer a warrant of attorney, executed by such claimant or claimants, executor or executors, administrator or administrators after the enactment of the resolution or act allowing the claim; and every such warrant of attorney shall refer to such resolution or act, and expressly recite the amount allowed thereby, and shall be attested by two competent witnesses, and be acknowledged by the person or persons executing it before an officer having authority to take acknowledgment of deeds, who shall certify such acknowledgment, and it shall appear by such certificate that such officer, at the time of the. making of such acknowledgment, read and fully explained such warrant of attorney to the person or persons acknowledging the same.”
Then the seventh section of the act of February 26,1853, (10 Stat., 171,) provides “that the provisions of this act, and of the act of July 29, 1846, entitled ‘An act in relation to the payment of claims,’ shall apply and extend to all claims against the United States, whether allowed by special acts of Congress, or arising under general laws or treaties, or in any other manner whatever.”
If these acts of Congress are applicable to such claims, and when prosecuted m this court, it must be obvious that the assignments are invalid, for by the express terms of the act of 1853, all such transfers and assignments, however made, and upon whatever valuable or meritorious considerations they are based, are made “absolutely null and void,” unless made after the allowance of the claim. This is so clear that no amount of argument or illustration could ,add to the cogency of the simple and direct language of the enactment; but it is insisted that these acts do not apply to cases litigated in this court, because—
1. The acts were intended to apply only to claims allowed by the executive departments.
2d. That even if they applied to proceedings in this court, they are repealed by the provisions of the act of March 3, 1863, reorganizing this court.
At the date of the passage of these acts, it is true, this court was not in existence. Nor was there any other court in which the United States could be directly sued on any account. The only mode by which the respective rights of the government and one of its citizens could be brought to the test of judicial arbitrament, was by the exercise of the right of reclamation or set-off, under the act of 1797, by a party having government funds in his hands when sued by the United States ; or by such incidental proceedings against officers in certain excise and revenue cases, as Were provided for by law; or by the *67 creation of special tribunals for certain classes of cases, as Congress saw proper from time to time.
Yet this consideration is not sufficient of itself to restrain the operation of these acts, or to prevent them applying in all their force to the claims prosecuted here, if the language of the acts is sufficiently broad and comprehensive to embrace them. That it is so, can admit of little doubt. The prohibition is against the assignment of “ any claim upon the United States, or any part or share thereof, or any interest therein.” Whatever, therefore, is a claim against the United States, is embraced in this interdiction. That the matter now in suit is such, can scarcely be the subject of a dispute. By virtue of certain military orders, the property of Coté was seized jure belli. By the fair interpretation of the acts of Congress relating to the seizure of property of supposed rebels, the property vested in the United States’ upon the capture being complete. This is the doctrine with regard to all property lawfully taken in war, whether taken upon the land or the sea.
The title of the owner, so soon as the captor has gained a firm possession, is considered as divested; and this usually is considered as occurring after twenty-four hours’ undisturbed possession by the captor, or after the booty has been carried into a place of safety, infra prœsidia. Gro. Lib. III, Cap. 6, § 3 ; Cap. 9, § 14. Klüber, Droit des Gens moderne de l’Europe, § 254. Vattel, t. 3, ch. 14, § 196 ; ch. 14, § 209. Hoefter, Das Europaisehe Yolkerrecht, § 136. The right is acquired not so much in virtue of the seizure of it as enemy’s property, as by virtue of the sovereign authority under which such seizure is made. Per Story J., in The Emulous, Gall., 569. We refer also to Stewart v. The United, States, 1 C. Cls. 113, where we have fully expressed our views on this point, and cited the leading authorities.
So it will be seen, on recurring to the various acts of Congress for seizing and confiscating the property of rebels, that the property vested unconditionally and irrevocably in the United States after the passage of the act of March 12, 1863. Before that, under the act of 17th July, 1862, the title though vested in the United States conditionally, might be considered as in abeyance, and their right liable to-be defeated and divested by a decree in favor of the owner, by the court before whom it was directed to be tried, and which decree would-be followed, as a matter of course, by an order of restitution. That would necessarily divest the inchoate or defeasible title acquired by the capture. But this whole system was changed by the act of March 12, 1863. ' That made the title of the United States complete and. *68 indefeasible by the capture. The property vested at once in the United States. There was no officer, agent, department or tribunal of the United States authorized in any manner to divest that title, or restore that captured property to the owner. The act is explicit in directing how the property shall be dealt with; the persons by whom, and the manner in which it shall be disposed of, and that the net proceeds of its sale shall.be paid into the treasury of the United States. These provisions supersede, and take the place of the prior mode of trying the legality of the capture, and the validity of the title the United States acquired thereby. These views are sustained by the very able opinion of Mr. Chief Justice Chase, in Mrs. Alexander's cotton, 2 Wallace, 404. If, therefore, the title became vested in the United States by this capture, it must be obvious that it could be divested only by some mode provided by law. Congress alone has the right to provide for the disposition of the property of the United States of every kind and description, and when they have so provided, all other methods than that designated become illegal and are wholly void.
If these views are correct, and this property of Mr. Coté even remained unsold in the hands of the United States, he no longer had any interest in the property, or claim to the title. There was even no reversionary or resultant interest in the thing as specific property, on which his sale or assignment could operate. A claim to the net proceeds was all that remained to him. And the instrument presented must be regarded simply as an attempt to assign or transfer an unsettled pecuniary demand or claim against the United States. This, we have already decided in the cases of Sines v. The United States, 1 C. Cls. R. 12, and Pierce v. The United States, ibid. 270, is forbidden in the strongest terms by the act of February 26, 1853.
We do not think, after a careful review of our former decisions, that the argument that the law is confined to claims settled at the departments is entitled to any great weight. The act is made to operate directly on the claims themselves, and not as limitations on, or definitions of, the power of those who are to adjust them, or adjudicate upon them. The statute says that such an assig-nment of “ any claim” “ shall be absolutely null and void.” What right can a judge or a court have, more than a Secretary or a Comptroller, to say that it shall be valid? It is not the act of any particular officer or department, or tribunal in connection with the adjustment and payment of a claim that is declared to be null and void. The act affects the assignment itself, made in contravention of its provisions. It takes from it every *69 vestige of virtue, the last spark of vitality, and leaves it totally defunct. No court, any more than an executive functionary, can animate or breathe into it the breath of life. The law says it shall he void ; who can say it shall be valid ?
Let us see whether these acts have been repealed, so far as this court is concerned. The affirmative of this position is argued from certain expressions used in the act of March 3, 1863, reorganizing this court. The 12th section provides that the petition of a claimant shall be verified by an affidavit, stating “ that no assignment or transfer of said claim, or any part thereof, or any interest therein, had been made, except as in said petition stated; ” and “that in order to authorize the court to render a judgment in favor of any claimant, if a citizen of the United States, it shall be set forth in the petition that the claimant and the original and every prior owner thereof, when the claim has been assigned, has at all times borne true allegiance,” &c. These provisions, it is alleged, not only recognize the right of an assignee to sue in this court, but prescribe the manner in which his claim shall be presented, and some of the conditions upon which a judgment may be rendered in his favor. Moreover, it is alleged that these provisions are inconsistent with the application of the acts of 1853 and 1846 to eases litigated in this court, and that the latter enactment will overrule the prior one and operate as an implied repeal.
These suggestions are not without their force. That the draughtsman of the latter statute may have had in his mind an adjudication in favor of an assignee is not at all improbable; that he did not at the same time have his attention directed to the stringent prohibitions of the act of 1853 is quite as likely; yet either or both of these being the fact would not change the law, unless he has used apt and appropriate words for that purpose, or unless there is such direct conflict and absolute repugnancy between the two acts that both cannot stand together.
Dwarris on Statutes, 532, says, repeals by implications are not favored in the law. Sedgwick on Stat. and Const. Law, 125 : “An act of Parliament may be repealed by the express words of a subsequent statute, or by necessary irresistible implication.” Dwarris, p. 530. So the Supreme Court of the United States, in the case of Wood v. The United States, 16 Pet., 362, says: “The question then arises whether the 66th section of the act of 1799, C. 128, has been repealed, or whether it remains in full force. That it has not been expressly or by direct terms repealed is admitted, and the question resolves itself into the more narrow inquiry whether it has been *70 repealed by necessary implication. "We say by necessary implication, for it is not sufficient to establish that subsequent laws cover some, or even all, of tbe cases provided for by it, for they may be merely affirmative, or cumulative, or auxiliary; but there must be a positive repug-nancy between the provisions of the new law and those of the old, and even then the old law is repealed only pro tanto to the extent of the repugnancy.” The same doctrine is maintained in Daviess v. Fairbairn, 3 How., 643.
Another rule equally well established is, that a general statute without negative words cannot repeal a previous statute which is particular, even though the provisions of one be different from the other. 6 Rep., 19; Dwarris, 532; 6 W. and S., 209 ; 10 Barr., 442; Brown v. County Com., 9 Harris, 43; 11 Rep., 63; Dyer, 347; 15 East., 377; 24 Pick., 296; 5 Hill, 221.
Is there any direct repugnancy or irreconcilable inconsistency between tbe two acts under consideration 1 Certainly not. On the contrary, there is no conflict whatever. Both may stand and neither infringe on the other, for it will be observed that the first provision quoted requires the party to state in his petition the interests in said claim, and whether any assignments have been made only by implication. There is no enacting clause that such assignments shall be set forth and declared upon, but the claimant, in his verification of the petition, is required to swear that no other assignment, &c., has been made, “except as in said petition stated,” and because it requires that the original and every prior owner, where the claim has been assigned, shall have borne true allegiance, &c., so that to reach the desired conclusion you have to draw the implication from another implication as shadowy and doubtful as the final one. This would be carrying the rule of implied and constructive repeal beyond all due and proper limits. So on the other rule, the statute prohibiting assignments is a special and particular statute, relating to that distinct subject-matter. It makes clear, positive, and definite provisions on the subject. Its prohibitions are direct, explicit, and peremptory ; while, on the other hand, the act of 1863 is a general law for the reorganization of a court to hear and determine claims against the government. Such á particular and positive statute as the former is never repealed by the general provisions of such as the latter, unless it is specially referred to in that statute, its enactments supplied or expressly repealed.
These provisions in the act of 1863, so far from overturning the act of 1853, entirely harmonize with it when we construe the latter act, not as sanctioning the assignments forbidden by the former, but as *71 requiring the party who brings the suit to disclose upon the record the whole origin and title of the claim. This was necessary in view of the provisions relating to set-off and fraud. It might also be necessary in relation to the right to call for books and papers, or to have discovery from a person other than the legal plaintiff on the record. Such might be the ease, too, where the legal party in whose name the claim is presented should be a mere naked trustee, or an agent not having disclosed the name of his principal. In all these cases, and many others that might be named, it would be important that the whole history of the claim should be fully disclosed. That would be important if for no other reason than to apprise those appearing for the United States of the persons and circumstances through and of whom any defence existing might be ascertained. In every light in which we can view these statutes, we think it would be unsafe and unwarranted to hold that the direet and positive enactments of the one are repealed, superseded, or supplied by the vague, indirect, inferential provisions of the other. We give to these latter the full scope and effect to which they are entitled, by construing them as in pari materia with the former statutes, and to be interpreted in subordination to, and in accordance with, the wise and salutary enactments of the acts of 1846 and 1853. These views result in sustaining the demurrer, the claimants to have thirty days in which to file an amended petition in accordance with this opinion, on failure of which the petition will be dismissed.