CARGILL, Inc., Libellant,

v.

THE FRANK A. LOWERY and Frank A. Lowery, THE ELLEN S. BOUCHARD, THE ELLEN BOUCHARD, Inc., and Bouchard Transportation Co., Inc., Claimant-Respondents,

and

Inland Survey Bureau, Inc., Respondent-Impleaded.

Civ. No. 5017.

United States District Court
N. D. New York.

June 4, 1957.

Atkins & Weymar, New York City, Horace T. Atkins, New York City, of counsel, for libellant.

Krisel, Beck & Taylor, New York City, Max Taylor, New York City, of counsel, for claimant-respondents.

FOLEY, District Judge.

The Report of the Commissioner as it covers his determination upon reference of the money damages to be paid libellant Cargill, Inc., by claimant-respondents Bouchard, has written exceptions filed to it by both sides. In my judgment, the exceptions of Cargill, which relate mainly to the reasoning by the Commissioner as to the failure of Cargill to minimize damages, are well taken and must be sustained. Such reasoning led to a most drastic reduction of the Cargill claim. The exceptions of Bouchard only aimed at collateral matters with no attack upon the amount of money damages fixed by the Commissioner had little merit, in my judgment, and in view of the disposition I make need no discussion and must be denied.

It has been a long voyage. The issue of the liability for the collision occurring on September 25, 1953, between the parties here, together with other interests involved, was decided adversely by me to the Bouchard interests. This opinion is reported in Lowery v. The Ellen S. Bouchard, D.C., 128 F.Supp. 16, and such decision was affirmed by the Court of Appeals, Second Circuit, on the opinion below. 229 F.2d 436.

■ The Report of the Commissioner is not sacrosanct by any means. By its terms Rule 43½ of the Rules of Practice in Admiralty and Maritime cases (28 U.S.C.A., Rules, Rule 43½) provides:

"* * * the report of the commissioner * * * shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment, is fully satisfied that error has been committed. * * *"

Even the application of the "clearly erroneous" doctrine allows the correction of apparent mistake. United States v. United States Gypsum Co., 333 U.S. 364, at page 395, 68 S.Ct. 525, 92 L.Ed. 746; Gindorff v. Prince, 2 Cir., 189 F.2d 897.

It is always with reluctance that I disturb the fact-finder, and more so here because of the skill and competence of the Commissioner in the conduct of and the rulings at the hearings as evidenced by the record made before him. However, the record of the trial before me was stipulated as part of the record before the Commissioner, and my recollection of it and my review of the evidence before the Commissioner, make the conclusion inescapable that the established rule as to the duty to minimize was too harshly and narrowly interpreted without due regard to the actualities and realities of the situation present at and shortly after the collision. It is also my feeling that if the Proctors for the libellant had argued and briefed the law and facts for the Commissioner as they did for me and suppressed any cock-sure attitude, it is

possible their present dilemma might have been avoided. Along this line I am frank to say I did not decide at the trial, or intend to so decide, any issue as to the amount of actual loss sustained by any party. The chief aim was to decide liability and responsibility, and the slight evidence as to damages was taken only to the extent material and helpful on this main issue. The duty to minimize never entered my mind.

■ However, this established principle of law concerning the duty to minimize, well-discussed by the Commissioner, must be considered and applied in view of the circumstances present. It is a rule of reason and prudence based on reasonable probability and honest, human judgment. It does not require infallibility or exactness of mathematical formula, and I cannot read such absolute in the cases cited by the Commissioner to support his inferences and conclusion. The Baltimore v. Rowland, 8 Wall. 377, 75 U.S. 377, 19 L.Ed. 463; Pettie v. Boston Tow-Boat Co., 2 Cir., 49 F. 464, 466; Pratt v. Havilah, 2 Cir., 50 F. 331; O'Brien Bros. v. The Helen B. Moran, 2 Cir., 160 F.2d 502, 504.

Whether the hiring of a competent cargo surveyor firm, as one would ask the judgment of a lawyer, doctor or engineer, would discharge the duty to minimize is not necessary to this decision because from my analysis the decision of Inland Survey Bureau, Inc., not to undertake salvage operations seems clearly justified. In a case with much similarity, it was decided that a 10% reduction for lack of diligence in conducting salvage operations was "a mere speculative reduction for which there exists no basis in fact." Grace & Co. v. Charleston Lighterage & Transfer Co., 4 Cir., 193 F.2d 539, 544.

Mr. Horn, President of the Inland Survey Bureau, was the straw man set up by the agile-minded Proctors for Bouchard both at the main trial and at the hearings before the Commissioner. I found no taint of any fraud or incompetence on his part or his firm when I rendered my opinion, nor do I see any

now. This firm has been in the marine survey business since 1927 or 1928 (page 24)[1] and the most eloquent and honest testimonial to the qualifications of Horn was made by Captain DeMars, the survey expert, called by Bouchard (page 136). The gist of such testimony is that Horn was one of the best to appraise the cargo problem of sunken wheat as it existed at the time and place.

There are many factors actually present that militate against the conclusion of the Commissioner and support the judgment, at least to show reasonableness, of Horn. Many are listed in my opinion and many are in the record before the Commissioner. The collision happened on a week-end. It was one of extreme force, as shown by the fact the barge captain at the end of the tow had no chance to get out. The testimony of the Army diver showed that this barge was practically split wide open. An emergency existed in the channel because the tug Kehoe ran afoul of the other sunken barge several hours after the collision. The barge owner formally and legally abandoned the barges several hours after the sinking. The Army Engineers were atop the situation the following morning and knew more about it than anyone else. I see no fault in Horn being down in New York City, a center of responsibility for decision by the Army Engineers with modern communications present to receive and evaluate reports from the people on the scene. Brennan, the Army Engineer in charge on the scene, was impressive at the main trial.

The cargo sunk was wheat, a perishable commodity, admittedly saturated and expanded to a point which changed its character, and as Horn put it before the Commissioner, just as wet one foot under the water as one hundred feet (page 64). See The Baltimore, pages 386, 387.

Another fact of great importance that had to be weighed by Horn in the interests of his client was the Summary Removal Statute (33 U.S.C.A. § 415). This statute (the Proctors for libellant admit it was not brought to the attention of the Commissioner) gave the Army Engineers the right to take over at any time in order to clear the channel. I think it important to consider because if Horn undertook salvage he had it all, cargo and barges, with the addition of someone looking over his shoulder armed with statutory authority to interfere if not satisfied.

A most decisive factor in the record that favors and warrants the decision not to spend money on private salvage is the admitted immensity of the task. Horn's estimate was two lighter barges, derrick, diver, pumps, clam shell, etc. (page 57). Then Captain DeMars with the statement that the equipment to salvage would have to come from New York, and he listed steam crane, barges, tug, etc. (pages 112–113). Match this against what the Army finally did and the decision of Horn, whether he be acting for Cargill or the underwriters, is surely reasonable, if not obvious. Many imponderable elements are natural in such situations.

Most vital of all to justify the estimate of Horn that it would cost $12,000 is the fact it actually cost the Army Engineers $17,751.43 for the entire operation. The wheat sold by the Army only obtained $2,945. It is interesting to note that the private bids requested by Inland were only slightly below the amount which was received by the Army Engineers after competitive bidding pursuant to the Statute. This net actual expenditure of $14,806.43 cannot be laughed off as government bookkeeping or the result of a "give-away" based merely upon innuendo without basis in fact. To corroborate further the intelligence and competency of Inland, the hulls were salvaged by Connie Ezmark's firm, the man Inland originally contacted on the whole problem. Again, this contract was awarded after competitive bidding.

[1]. (Page references shall only be to record before Commissioner.)

■ There is nothing between the testimony of DeMars, a hull surveyor, and the two alleged experts from New York, one a dairy farmer, in the effort to establish the value of animal feed in the New York market. Even if such evidence were reliable and in closer harmony with reality, it is questionable whether the New York City value would legally be the proper market for the ascertainment of value in this case. The proper measure of damages is the damage sustained by the party *at the time and place of injury.* Smith v. Condry, 1 How. 28, 42 U.S. 28, 11 L.Ed. 35; The City of New York, D.C., 23 F. 616. Despite this question the holding that the libellant should transport the wheat to the New York market again accentuates the extreme burden sought to be placed by a tort feasor on an innocent party.

There is not one fact I can find to support the exaggerated and speculative inference urged by Bouchard that someone obtained a tremendous bonanza from the purchase of this wet and damaged wheat. The combined experience and competence of Inland Survey and the Army Engineers in the ordinary course of their business are the best answer to such unproven speculation.

All this adds up to the common sense of the situation. As recently stated by the United States Supreme Court in Peak v. U. S., 353 U.S. 43, 77 S.Ct. 613, 615, 1 L.Ed.2d 631: "That seems to us to be the common sense of the matter; and common sense often makes good law."

I shall confirm the disallowance of the sum of $1,385.43 for the damaged grain aboard the Inez Lowery, which did not sink. I do this upon the second ground set forth by the Commissioner at page 20, inasmuch as the evidence supports his conclusion that the amount of water absorbed by the grain was negligible.

■ The libellant may recover for a total loss of cargo on the barges Marion O'Neil and Mae Lowery money damages from the Bouchard interests in the amount of $75,000. Libellant may recover the expenditure of $527.67 for the services of Inland, for a total award of $75,527.67, with interest and costs, in accordance with the interlocutory decree.

The exceptions of the libellant in accord with and material to this decision are Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth only as to amounts above, and Seventeenth. These exceptions to the Report are sustained and granted. The exceptions filed by Bouchard, claimant-respondent, are denied.

The Report of the Commissioner is modified as indicated herein, and as so modified is confirmed. A final decree in accordance herewith shall be submitted if agreed upon, otherwise settled on three days' notice.