**UNITED STATES of America,**
**Libelant,**

v.

**CARGO SALVAGE CORPORATION,**
**Respondent.**

United States District Court
S. D. New York.

March 31, 1964.

Robert M. Morgenthau, U. S. Atty., for the Southern Dist. of New York, for libelant; Louis E. Greco, New York City, Thomas F. McGovern, Washington, D. C., Philip A. Berns, of counsel.

Bigham, Englar, Jones & Houston, New York City, for respondent; Richard F. Shaw, Donald M. Waesche, Jr., New York City, of counsel.

FEINBERG, District Judge.

This is a declaratory judgment action brought by the United States to determine whether it or respondent Cargo Salvage Corporation has the right to cargo aboard a wrecked vessel on the bottom of Lake Huron. For reasons indicated below, the Court concludes that the cargo belongs to respondent.

The S.S. Monrovia, a Liberian ship, with a cargo of steel,[1] sank in the Lake as a result of a collision with the S.S. Royalton on June 25, 1959. The ship went down to the west of the westerly limit of the heavily trafficked[2] downbound lane[3] of the Lake. From a survey of the wreck taken by the United States Army Engineers ("Engineers")[4] in 1960, it appears that the superstructure of the ship is seventy-four feet below the surface, the hull with cargo below that depth, and the top of the masts of the ship are between twenty-five and twenty-nine feet below the surface.[5] The cargo of steel in its original state was worth about half a million dollars;[6] its salvage value is unclear.

On October 1, 1959, a Chicago law firm sent a letter[7] to the Engineers to inform them that the owner of the hull had abandoned all claim to the vessel, and that the cargo interest represented by a New York law firm intended to undertake cargo salvage operations. A formal letter[8] of abandonment from the agents of the owner of the hull to the Engineers followed on October 16, 1959. Meanwhile, the cargo interest was making plans to salvage the cargo of steel. After learning of the sinking within two or three days after it happened,[9] the cargo underwriters retained a New York law firm to protect their interests.[10] Assignments were made by the individual underwriters to one corporation, respondent Cargo Salvage, so that negotiations with potential salvors could be facilitated.[11] By September 1959, a list of salvors was compiled and letters were then written to them to ascertain their interest in bringing up the cargo aboard the S.S. Monrovia.[12] A contract to salvage the cargo was entered into by August 8, 1960.[13] However, this contract was never carried out for reasons which are not clear in the record.[14]

Apparently, at about the same time, the Engineers were also making plans to salvage the cargo. On September 23, 1960, the Engineers issued invitations for bids to remove the wreck of the S.S. Monrovia to a clear swept depth of forty feet.[15] This came to the attention of the

---

1. There was other cargo aboard, but no claim is asserted by its owners.

2. During 1961, there were 5,768 vessel passages along the down-bound lane. Transcript [hereinafter cited as "Tr."], p. 68. The navigation season on Lake Huron is roughly coextensive with the spring and summer months. Tr. pp. 52, 68, 85.

3. Tr. p. 50. The up-bound and down-bound lanes are set by the Lake Carriers Association.

4. A survey was first attempted in the fall of 1959, but had to be abandoned because of adverse weather. The survey was completed in April 1960. Tr. p. 68.

5. Tr. pp. 48–49.

6. Tr. pp. 92–94, 131.

7. Libelant Ex. 3.

8. Libelant Ex. 1.

9. Tr. p. 161.

10. Tr. p. 145.

11. Tr. pp. 145–46.

12. Tr. p. 147.

13. Tr. p. 150; Respondent Ex. J.

14. Tr. p. 151.

15. Tr. p. 29; Respondent Ex. A.

cargo interest. By letter dated September 29, 1960, the cargo interest informed the Engineers that it intended to salvage the cargo and that it would "hold United States and the Contractor full [*sic*] responsible for any loss which may be incurred."[16] This was the first letter directly from the cargo interest to the Engineers informing them that it actually intended to commence salvage operations.[17] As a result of the September 29, 1960 letter to the Engineers, their invitations to bid were cancelled.[18] Suit was instituted by the United States in October 1961. In January 1963, Cargo Salvage entered into a contract with another salvor,[19] but the Engineers have not issued a salvage permit to this salvor. Because the parties cannot agree on a suitable salvor or fee, the S.S. Monrovia, together with her cargo, still lies below the surface of Lake Huron with a buoy overhead warning off traffic.[20]

Respondent bases its claim to the cargo on assignments made to it by the insurance underwriters who became subrogated to the rights of the cargo interest upon payment to it of the insured value. Libelant United States claims that it has the right to dispose of the cargo pursuant to Section 19 of the Rivers and Harbors Appropriation Act of March 3, 1899, 30 Stat. 1154, 33 U.S.C. § 414, arguing that this statute permits it to remove and dispose of an obstruction to navigation and all cargo on board, if the obstruction is not removed by the private owner. Application of the statute in this case to cut off the alleged rights of the cargo interest raises questions of statutory construction and, according to Cargo Salvage, constitutional issues, as well.

The United States argues that Cargo Salvage does not have any legal interest in the cargo or, if it does, it must recover its full damages for any injury from a third party. The contentions that

Cargo Salvage has no proper interest in the cargo will be considered first.

■ The government attacks the assignments to Cargo Salvage on a number of grounds. The first is that the only consideration for the assignments were promises by Cargo Salvage that it would endeavor to effect salvage and after "payment of all proper expenses and charges" would turn over any net recovery to the underwriters. The government argues that these are "assignments for collection" and as such do not convey sufficient interest to Cargo Salvage to allow it to make claim to the cargo. However, an "assignment for collection" conveys legal title and interest to maintain suit. Rosenblum v. Dingfelder, 111 F.2d 406 (2 Cir. 1940); see generally 3 Moore, Federal Practice ¶ 17.09 p. 1341 (2 ed. 1963).

■ The government further contends that the assignments to Cargo Salvage are null and void by virtue of the anti-assignment statute, 31 U.S.C. § 203. This statute nullifies assignments of claims upon the United States unless there is compliance with certain conditions, concededly not met by the assignments involved here. In support of its position, the government cites, *inter alia,* United States v. Gillis, 95 U.S. (5 Otto) 407, 24 L.Ed. 503 (1877) and Coté v. United States, 3 Ct.Cl. 64 (1867). In those cases, confederate property had been lawfully seized by the government during the Civil War and sold. Suit was brought for return of the proceeds under an act of Congress setting forth the conditions under which the former owners of property so seized could claim the proceeds of the sale of the property. Act of March 3, 1863, 12 Stat. 820. It was held in both cases that the anti-assignment statute forbade assignments of claims for these proceeds. However, in those cases the United States was clearly the owner of the property before it

16. Libelant Ex. 4.

17. Tr. p. 29.

18. Tr. pp. 33–34.

19. Tr. p. 151; Respondent Ex. K.

20. Tr. pp. 60, 82, 85, 152–54. The buoy is being maintained by the Engineers at an annual expense of $600.

was sold so that any claim on the proceeds was a "claim upon the United States." Coté v. United States, supra at 67. Here, it must be determined whether the United States has any right to the cargo at all. Under these circumstances, it would be a strained construction indeed to regard Cargo Salvage's claim on the cargo as a "claim upon the United States." In any event, in urging the application of the anti-assignment statute to bar Cargo Salvage, the United States assumes as a basic premise that it has obtained title to the cargo under 33 U.S.C. § 414, the very thing in dispute. Accordingly, the anti-assignment statute does not require judgment for libelant.

■ The United States further argues that Cargo Salvage should not be allowed to interfere with assertion by the United States of interest in the cargo, since Cargo Salvage can obtain full recovery for loss of the cargo from the S.S. Royalton. In a suit brought by cargo owners and underwriters against the S.S. Royalton growing out of the collision which sank the S.S. Monrovia, the Sixth Circuit has held that the S.S. Royalton was partly at fault in causing the collision and resulting loss. Federal Ins. Co. v. S.S. Royalton, 312 F.2d 671 (6 Cir. 1963). However, the fact that Cargo Salvage may have a claim against the S.S. Royalton does not mean that it is not entitled to salvage the cargo, if it is the legal owner thereof. In fact, the converse is true, since it has a legal obligation to mitigate damages and salvage, where feasible, is part of this obligation. Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 316 F.2d 163, 171 (5 Cir. 1963); Cargill, Inc. v. The Frank A. Lowery, 159 F.Supp. 133 (N.D.N.Y.1957), aff'd per curiam, 251 F.2d 845 (2 Cir.), cert. denied, 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed. 2d 845 (1958).

Finally, the government urges that Cargo Salvage has no interest in the cargo because, for various reasons,[21] it did not acquire its interest within thirty days after the sinking and, therefore, under 33 U.S.C. § 414 has no legal interest in the cargo. These arguments, however, assume as a premise the application of 33 U.S.C. § 414 to the cargo. Therefore, it is quite clear that it is necessary to consider the application of 33 U.S.C. § 414 to the facts of this case. This statute deals with non-emergency situations (emergency situations are covered by 33 U.S.C. § 415 discussed below). Section 414 provides as follows:

"Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: *Provided,* That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To whom it may concern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof: *And provided also,* That the Secretary of the Army may, in his discretion, at or

---

21. The arguments are (1) the assignments by the underwriters were not made within thirty days of the sinking, (2) there is no proof that the underwriters themselves acquired any interest through sub-

rogation within thirty days of the sinking, (3) any interest Cargo Salvage had was lost by operation of law. Trial Brief of the United States, pp. 4–10

after the time of giving such notice, cause sealed proposals to be solicited by public advertisement, giving reasonable notice of not less than ten days, for the removal of such obstruction as soon as possible after the expiration of the above specified thirty days' notice, in case it has not in the meantime been so removed, these proposals and contracts, at his discretion, to be conditioned that such vessel, boat, water craft, raft, or other obstruction, and all cargo and property contained therein, shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States: *Provided,* That such bidder shall give satisfactory security to execute the work: *Provided further,* That any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph shall be covered into the Treasury of the United States."

The key questions in construing Section 414 are: (1) whether it can be used to cut off the rights of an owner of cargo, as well as the rights of the owner of a vessel; (2) if so, whether the cargo must independently be an obstruction to navigation for the statute to be applied; and (3) whether notice under the statute must be given to the cargo interest.

In support of the position that all cargo in submerged vessels which become obstructions to navigation are covered by the statute, the United States relies on the following language from the second proviso in Section 414:

"[T]he Secretary of the Army may * * * cause sealed proposals to be solicited * * * for the removal of such obstruction * * *, these proposals and contracts, * * *

to be conditioned that such vessel, boat, water craft, raft, or other obstruction, *and all cargo and property contained therein,* shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States * * *." (Emphasis added.)

The United States argues that the emphasized language clearly extends the reach of the statute to all property contained in the sunken vessel, including cargo. Respondent interprets the word "cargo" in this section as meaning only cargo owned by the owner of the vessel, and not cargo (such as the steel here) owned by another interest. This argument is based on the fact that the word cargo does not appear in the first part of Section 414, which provides that any sunken vessel which obstructs navigation for more than thirty days is subject to being "broken up, removed, sold, or otherwise disposed of by the Secretary of the Army * * *." Nor does the word cargo appear in the immediately following first proviso which provides that notice, in the discretion of the Secretary of the Army, requiring the removal of the obstruction may be given in a newspaper published nearest the locality of the obstruction. Respondents then argue that "the words 'cargo and property,' used for the first time in this third part of section 414, appear to have been included as an afterthought." [22] To insulate this section from constitutional doubt, it is urged that this Court interpret cargo to mean only cargo owned by the owner of the vessel. We are not told, however, upon what language or other policy to base such a distinction. In response, the United States argues that there is no distinction in the statute between cargo owned by the vessel owner and cargo owned by others.

Section 414 was originally passed in 1899, and the legislative his-

---

22. Brief on Behalf of Respondent, Cargo Salvage Corporation, p. 23.

tory is meager.[23] The House Report references to this section were lumped together with what is now 33 U.S.C. § 415. Section 415 calls for the summary removal by the government of obstructions to navigation which "stop, seriously interfere with, or specially endanger navigation" and provides that the cost of removing the obstruction "shall be a charge against such craft and cargo * * *."[24] Regarding these two sections, the House Report states that:

"[T]he two sections afford provision for the interests of commerce and at the same time give to the *owners of wrecks* and *abandoned property* all possible protection consistent with the essential interests of navigation." (Emphasis added.)

H.R.Rep.No.1826, 55th Cong., 3d Sess. 4 (1899). Thus, the Report describes three separate interests: "interests of commerce," "owners of wrecks," and owners of "abandoned property."[25] The House Report also states that (ibid.):

"This act modifies the existing law. It contains two provisions—section [414], providing for ordinary cases, the scope of which is not greatly different from existing statutes on the subject. * * *"

Once the previous statutes governing removal of wrecks are examined, it becomes evident that cargo meant, at the time of the passage in 1899 of what is now 33 U.S.C. § 414, an interest totally distinct from the ownership of the vessel itself. Thus, Section 4 of the Rivers and Harbors Act of June 14, 1880, 21 Stat. 180, 197 stated:

"Whenever * * * the navigation of any river, lake * * * or other navigable water of the United States, shall be obstructed or endangered by any sunken vessel or water-craft, it shall be the duty of the Secretary of War * * * to cause reasonable notice, of not less than thirty days, to be given, personally or by publication, at least once a week in the newspaper published nearest the locality of such sunken vessel or craft, *to all persons interested in such vessel or craft, or in the cargo thereof*, of the purpose of said Secretary, unless such vessel or craft shall be removed as soon thereafter as practicable by the parties interested therein, to cause the same to be removed. If such sunken *vessel or craft and cargo* shall not be removed by the parties interested therein as soon as practicable after the date of the giving of such notice by publication, or after such personal service of notice, * * * such sunken vessel or craft shall be treated as abandoned * * * and the Secretary of War shall proceed to remove the same. *Such sunken vessel or craft and cargo and all property therein* when so removed shall * * * be sold to the highest bidder * * * and the proceeds of such sales shall be deposited in the Treasury of the United States." (Emphasis added.)

The Rivers and Harbors Act of August 2, 1882, 22 Stat. 191, 208, enlarged the power of the Secretary of War to allow him to "sell and dispose of any such *sunken craft, vessel, or cargo, or property therein*, before the raising or removal thereof * * *." (Emphasis added.) The prior statutes clearly differentiated between interest in the vessel and interest in the cargo and there is nothing to

---

23. See generally Koonce, Federal Laws Affecting River & Harbor Works, speech given at the Engineer School, Fort Humphreys, Virginia (April 23, 1926), attached to Trial Brief of the United States.

24. In Cargill, Inc. v. The Frank A. Lowery, supra, the Engineers removed and sold a barge and cargo under 33 U.S.C. § 415 and retained the proceeds from the sale of the cargo even though owned independently of the hull. The wording of §§ 414 and 415 are similar and should be construed in *pari materia*.

25. Of course, it may be argued, as no doubt respondent would, that "owners of wrecks and abandoned property" refers to one interest.

indicate that the present statute does not do the same or that it limits the cargo affected to that owned by the owner of the vessel. I hold that Section 414 refers to cargo as a separate interest from the vessel and gives the United States the power to dispose of such cargo in accordance with the statutory terms.

■ The next question in construing this statute is raised by Cargo Salvage's argument that even if Section 414 applies to cargo owned by an interest independent of the hull, the hull of the S.S. Monrovia and the cargo do not constitute an obstruction to navigation and, consequently, Section 414 is inapplicable to the cargo. Although one witness called by the United States testified that it would be safer for navigation if the wreck of the S.S. Monrovia were completely removed,[26] that same witness, as well as another, said that the ship is a menace to navigation because its masts remain between twenty-five and twenty-nine feet below the surface, and would not be a menace to navigation if the top of the ship's masts were forty feet below the surface of the Lake.[27] The superstructure, hull and cargo are well below forty feet.[28] In the amended invitations to bid,[29] the Engineers required the contractor to remove the masts only to a clear swept depth of forty feet. Such destruction of the masts would not interfere with the cargo in the hull.[30] Thus, I find that the ship is a menace to navigation only because her masts reach above forty feet below the surface, and that her cargo and hull are below forty feet.

■ Respondent interprets Section 414 as requiring the dividing of a ship into segments and would require the cargo and hull containing it to be an independent menace to navigation in order for the statute to operate upon them. However, the statute refers to obstruction by "any sunken vessel * * *," and a mast is part of the vessel. The statute is in terms of the entity, and not its individual parts. Carried to its logical extreme, respondent's reasoning would result in dividing vessels into bow and stern, superstructure and hull, port and starboard, an approach clearly illogical and impractical. In Zubik v. United States, 190 F.2d 278, 282 (3 Cir. 1951), the Court held that a lower barge was an obstruction to navigation even though it did not independently menace navigation, but merely served as a foundation upon which rested another barge which did obstruct navigation. I hold that if any part of a ship constitutes an obstruction to navigation, this is enough to trigger the statute.

All of the above brings us to the major problem raised by this case—whether any notice under Section 414 must be given by the government to the cargo interest before its right to cargo can be cut off. It is clear that no such notice was given by the government to the cargo interest before the invitations to bid were issued on September 23, 1960.[31] The government contends that there is no legal obligation upon it to give notice to anyone—even the hull owner—since the statute requires the Secretary of the Army to do so only in his discretion.[32] The government's position is that failure of the cargo interest to remove, or indicate an intention to remove, within thirty days cut off its rights, despite the undisputed fact that no notice of this eventuality was given. Cargo Salvage responds that there is a positive obligation under the statute to give notice to the cargo interest and that, if the statute is not so construed, it is unconstitutional

26. Tr. pp. 46–47, 50.

27. Tr. pp. 47, 101.

28. Tr. pp. 48–49.

29. Respondent Ex. A.

30. Tr. pp. 51–52, 101.

31. Tr. p. 98; Libelant's Supplemental Brief, pp. 1–4.

32. Libelant's Supplemental Brief, p. 5, citing Zubik v. United States, 190 F.2d 278 (3 Cir. 1951).

as a deprivation of property without due process of law.

Section 414 is not a model of clarity and resolution of the problems raised by its construction is troublesome. Cf. United States v. Bethlehem Steel Corp., 319 F.2d 512 (9 Cir. 1963), cert. denied, 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964). The questions raised include the following: does Section 414 require notice to interested parties; if not, is it constitutional; if it does provide for notice, is notice to the hull owner sufficient or must notice be given to the cargo interest, as well; if only the former, does this deprive the cargo interest of constitutional rights; if the government is not required to give notice, but decides to do so, must the notice be to both the hull owner and cargo interest; if notice is given solely to the hull owner, does this violate any constitutional right of the cargo interest? [33]

■ On the subject of notice, Section 414 provides only:

"That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To whom it may concern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof * * *."

The notice called for by the section appears to be discretionary, not obligatory. This construction is in accord with Zubik v. United States, 190 F.2d 278 (3 Cir. 1951). In that case, the Court held that since notice under Section 414 was purely discretionary, removal of a barge was not arbitrary or unreasonable, even though notice had not been given to the owner. This is a change from Section 414's predecessor quoted above (Section 4 of the River and Harbor Act of June 14, 1880). That statute required the Secretary of War to give reasonable notice "to all persons interested in such vessel * * * or in the cargo thereof, of the purpose of said Secretary, unless such vessel or craft shall be removed as soon thereafter as practical by the parties interested therein, to cause the same to be removed" and provided that such notice could be given either by publication or personally. The change in the notice requirement, of course, is a substantial one, despite the statement in the House Report quoted above that the "scope" of what is now Section 414 "is not greatly different" from the prior statutes. Thus, it is reasonably clear that the statute envisions cutting off of the rights of the hull owner and cargo interest even if the government gives no notice to either party.

Whether this is constitutional is another problem. However, it is not necessary to reach the constitutional question because the crucial issue in this case is whether, if the government decides to give notice in its discretion, notice must be given to both the hull owner and cargo interest. This problem is one of statutory construction and, ultimately, of constitutional validity, since construction of the statute to allow notice to only one interest may be unconstitutional.

■ Section 414 obviously contemplates the possibility of notice. It refers

33. Some other questions raised by § 414 which need not be answered at this time are (1) does the thirty-day period start running from the time of the wreck (the government's position here), from the time the Engineers determine the wreck to be an obstruction, or from the giving of notice; (2) is the thirty-day period required for removal so short as to be unconstitutional; (3) what is the effect of the government's practice of not requiring removal within thirty days, but only an intention to remove (see note 41 infra); and (4) if a cargo interest acts within a thirty-day period, does it merely have to remove its cargo or also remove the obstruction? In Zubik v. United States, supra, cargo was removed from a barge some three months after sinking leaving the barge still an obstruction to navigation, apparently without objection by the government.

to the discretionary right of the Secretary of the Army to cause "reasonable notice of such obstruction * * * to be given by publication, addressed 'To whom it may concern' * * *." Under the prior statutes, notice by publication or personal service was required to both hull owner and cargo interest. There is nothing in Section 414 which would indicate that the notice recognized by the present statute, when a decision is made to give notice, should be different. Having construed Section 414 on the basis of earlier statutes to allow cutting off the cargo interest, it is both logical and fair to regard the earlier statutes as weighty indeed on the question of what notice has to be given under Section 414 when a decision is made to give any notice at all. Moreover, no compelling reason is urged on the Court as to why the cargo interest should get less notice under this formidable statute than the hull owner; indeed, considerations of equity dictate a contrary result. The notice contemplated by Section 414 is a broad one, addressed "To whom it may concern." In addition, construing the statute to require notice to both the cargo interest and hull owner, when a decision is made to give any notice at all, makes it unnecessary to decide the constitutional question inherent in differentiating between the two interests in terms of notice. This result has traditionally been regarded as a desirable one. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion). Accordingly, I construe Section 414 as requiring notice, by publication or otherwise, when notice is given at all, to both hull owner and cargo interest.

The crucial question, therefore, becomes whether the government has decided to furnish any notice at all under Section 414. Throughout the period of this controversy a regulation of the Engineers, 33 C.F.R. § 209.190 provided, in part, as follows:

"§ 209.190 Removal of wrecks and other obstructions.

"(a) *Laws relative to removal of wrecks and obstructions.* The laws relating to removal of wrecks are contained in sections 15, 19, and 20 of the River and Harbor Act of March 3, 1899, and section 1 of the act of August 16, 1937. Section 15 of the former act provides that it shall be the duty of the owner to mark the location of the wreck immediately and until removed or abandoned; *sections 19 and 20 authorize removal under the direction of the Secretary of the Army if the owner does not take action;* section 19 governs in cases where removal is not an urgent necessity; and section 20 applies to emergencies where the interests of navigation require immediate action. Section 1 of the latter act provides for action in case the owner fails to mark a wreck suitably.

\* \* \*

"(c) *General procedure on wrecks and obstructions.* (1) District Engineers receiving information of the existence of any wreck or similar obstruction in navigable waters of the United States within the limits of their districts will at once ascertain whether navigation is obstructed or endangered. *If the obstruction is found to be of a character requiring removal thereof the District Engineer will promptly inform the owner of the provisions of law on the subject.*

"(2) Vessel owners, masters and *others interested* are encouraged to send to the District Engineer as prompt and accurate reports as possible of wrecks and their approximate location.

"(3) If removal is commenced by the owner the District Engineer will keep himself informed of the progress of the work and will exercise

sufficient supervision of the operations to insure that they cause no unreasonable interference with navigation and that the operations are diligently prosecuted as required by law. If removal by the United States is found necessary proceedings must be promptly instituted in accordance with the appropriate provisions of law. In such case if the owner has not marked the obstruction the District Engineer will immediately request the district commander of Coast Guard to see that marks are established.

"(4) In the removal and disposal of sunken vessels the District Engineer will ascertain from the owner, if known, whether there is a Government interest in the vessel by way of mortgage or otherwise, and if such interest be found he will ascertain what disposition is desired by the Maritime Commission or other agency of the Government having such interest before offering the vessel for sale to the public.

\* \* \*

"(h) *Removal of obstructions under section 19 of the River and Harbor Act of March 3, 1899.* Action under this section for removal of an obstruction requires prior authority from the Chief of Engineers and may be undertaken only when navigation of navigable waters of the United States is obstructed or endangered, and if the obstruction has been in existence for a longer period than thirty days, or its abandonment by the owner can be legally established in a shorter period. The obstruction can be removed by any

method deemed most advantageous." (Emphasis partially added.)

Thus, it is clear that the government in this Regulation has taken upon itself the obligation of providing some notice under Section 414, that is to "promptly inform the owner of the provisions of law on the subject" of removal of wrecks.[34] The Regulation is clearly designed to implement the statutory scheme. Under the statute, since there is a general course of conduct of giving notice, that notice must be given to the cargo interest, as well as to the hull owner. This was not done here [35] and, therefore, the rights of the cargo interest were not cut off under Section 414. An analogous situation arises where an official is given discretionary power by statute but promulgates regulations as to how the power is to be exercised, and then fails to follow his own regulations. In such a case, the action is of no effect. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L. Ed. 681 (1954); see also Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).[36] Similarly here, although it may be that the Secretary of the Army is not required to give notice, a decision to give notice to only one interest violates the statutory requirements.

The United States argues that no notice was required since (1) the Engineers assumed that the cargo interest had given up any attempt to salvage; (2) the cargo interest knew of the hull owner's abandonment; and (3) the Engi-

---

34. Neither party in its pre- or post-trial briefs or at trial informed the Court of this Regulation. However, in a conference held after the trial, the Court called the Regulation to the attention of the parties to ascertain their position with respect thereto. Subsequently, additional briefs were submitted, and the United States reasserted its previous arguments and made some additional points, which will be discussed below.

35. Tr. p. 95; Libelant's Supplemental Brief, p. 1. By October 1959, the Engineers knew there was a separate cargo interest. Tr. p. 28.

36. Cargo Salvage argues that the Regulation, as well as § 414, requires notice to cargo interest. Respondent's Supplemental Brief, p. 8.

neers have the right to deal with the hull owner as the bailee or agent of the cargo interest.

The argument that it was assumed by the Engineers that the cargo interest had given up any attempt to salvage is probably based on the October 1, 1959 letter from the Chicago law firm representing the hull owner to the effect that the hull owner abandoned his interest and that the cargo owner, represented by a New York law firm, intended "to undertake cargo salvage operations *this autumn.*" [37] (Emphasis added.) This communication from a third party is not sufficient to excuse compliance by the Engineers with the applicable statutory notice requirements in light of the Regulation because (1) there is no indication that the cargo interest knew of the statutory requirement and (2) there is no evidence that their intention was, in fact, limited to salvage operations in the autumn of 1959. The facts show that the cargo interest sent a form letter to some twenty-two marine contractors requesting bids to either salvage the cargo or purchase the cargo on an "as is" basis, and that an agreement was made in August 1960 by the cargo interest with a salvor.[38] Rather, it may be (depending upon when the thirty-day statutory period ends) [39] that once the Engineers knew there was cargo aboard the vessel and knew the name of the law firm representing cargo, they should have checked to see whether the cargo interest had received reasonable notice, by publication or otherwise, under Section 414.

Further, even if the cargo interest knew of the hull owner's intent to abandon, it did not necessarily know at that time of the provisions of law (which the Engineers' Regulation required be called to the attention of the "owner") and of the Engineers' view that 33 U.S.C. § 414 was applicable to cargo owned independently of the hull. Lastly, it is not correct that notice to the cargo interest could be given here through notice to the hull owner. It is true that in certain emergency situations, the master of a ship can act as agents for cargo. However, this doctrine does not have application where the cargo owner can be communicated with without imprudent delay. Carver, Carriage of Goods By Sea, 507–14 (10th ed. 1957). The government cites an early case in which the master of a ship was allowed to institute suit on behalf of cargo for damages resulting from a wreck. Newell v. Norton and Ship, 70 U.S. (3 Wall.) 257, 18 L.Ed. 271 (1865). However, no case is cited to the Court holding that this doctrine has application to a notice statute, especially where notice by publication is authorized and where the time for action does not preclude notice to the cargo interest directly. As a matter of fact, this agency argument undermines the Engineers' ultimate legal position. If the hull owner acted as agent for cargo interest, then its letter of October 1, 1959,[40] informing the Engineers of the cargo interest's intention to salvage, was as effective as if it came directly from the cargo owner. It is true that this letter came three months after the collision, but it did arrive seven months before the Engineers surveyed the wreck presumably to determine whether there was an "obstruction" to

---

37. Libelant Ex. 3.

38. Tr. p. 147; Respondent Ex. J. This agreement was never carried out. It is not clear from the record whether the Engineers knew about this contract when they sent out the invitations to bid the following month, but it is clear that they knew of the contract shortly thereafter. Tr. pp. 88–92; Respondent Ex. B.

39. See note 33 supra. Under the earlier statutes, "reasonable notice, of not less than thirty days" was required to be given and the "vessel" was "treated as abandoned" if the "vessel or craft and cargo [was] not * * * removed by the parties interested therein as soon as practicable after the date of the giving of such notice by publication, or after such personal service of notice * * *."

40. Libelant Ex. 3.

navigation. It is certainly not clear from the record that when the letter of October 1, 1959 was received, the Engineers regarded the interest of any "owner" as already foreclosed.[41]

Lastly, the Engineers argue that by September 29, 1960,[42] Cargo Salvage had actual notice of the provisions of law.[43] This point is presumably made to support the proposition that within some period after that date, Cargo Salvage was required to comply with the statute. However, in the face of the already asserted competing claim of the government to the cargo, it would be unreasonable to require Cargo Salvage to effectuate removal, unless the dispute with the United States was amicably adjusted, or otherwise determined. The claim of the government to the cargo would obviously have an inhibiting effect on any salvage contractor engaged by the cargo interest.[44]

Accordingly, I hold that the interest of Cargo Salvage in the cargo in question has not been cut off. This does not mean that the Engineers at some future date may not enforce 33 U.S.C. § 414 against this cargo. Vitarelli v. Seaton, supra, 359 U.S. at 546, 79 S.Ct. 968, 3 L.Ed.2d 1012. It does mean that at the time of the decree to be entered herein, the government does not have any interest in the cargo. Thereafter, Cargo Salvage may take immediate steps in compliance with Section 414 and any applicable regulations to salvage the cargo.

This opinion incorporates findings of fact and conclusions of law pursuant to Admiralty Rule 46½. Submit decree on notice in accordance with this opinion.

---

41. The government made clear at trial that its position is not that removal of an obstruction must be completed within a thirty-day period, but that within this period the Engineers must be informed that the obstruction will be removed. Tr. pp. 19–20; Libelant's Supplemental Brief, p. 7.

42. This was the date of letter from the cargo interest to the Engineers after learning of plans by the United States to dispose of the cargo. See text accompanying note 16 supra.

43. Libelant's Supplemental Brief, p. 3.

44. That contractors looked to the value of the cargo for their profit is shown by Respondent Exs. A, J, and K.