UNITED STATES of America

v.

BETHLEHEM STEEL COMPANY, and Moran Towing and Transportation Company, Inc.

Adm. No. 4599.

United States District Court
D. Maryland.

Nov. 17, 1964.

John W. Douglas, Asst. Atty. Gen., Civ. Div., Leavenworth Colby, Chief, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., and Thomas J. Kenney, U. S. Atty., Baltimore, Md. (Thomas F. McGovern, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., of counsel), for libelant.

Semmes, Bowen & Semmes, Baltimore, Md. (David R. Owen, Baltimore, Md., of counsel), for respondent Bethlehem Steel Co.

Ober, Williams & Grimes, Baltimore, Md. (Southgate L. Morison, Baltimore, Md., of counsel), for respondent Moran Towing & Transportation Co., Inc.

THOMSEN, Chief Judge.

This is an action for declaratory judgment and other relief, based on 33 U.S. C.A. §§ 403 and 406. It arises out of the grounding in navigable waters just north of Brewerton Channel, off Sparrows Point, in the Baltimore Harbor, of a floating dry dock belonging to Bethlehem Steel Company (Bethlehem), which Moran Towing and Transportation Company, Inc. (Moran) had undertaken to tow down the Chesapeake Bay, through the Capes and out to sea so that it might be destroyed by sinking beyond the 1,000 fathom curve. The issues of law are novel and the facts are unprecedented.

The government contends that the grounded dock constitutes an obstruction to the navigable capacity of the Patapsco River, created by Bethlehem and Moran, within the meaning of 33 U.S.C.A. § 403, and that the government is entitled to an injunction under 33 U.S.C.A. § 406 requiring Bethlehem and Moran either to remove the dock or reimburse the government for the cost of removing it.

Respondents contend that the case is not covered by sec. 403, but by the provisions of the Wreck Act, 33 U.S.C.A. §§ 409, 414 and 415; that the dock is a "vessel" or "other craft" abandoned by the owner within the meaning of sec. 409; and that any liability for the costs of removal is in rem against the dock and not in personam against either Bethlehem or Moran. In reply, the government argues that the dock is not a "vessel" or "other craft" within the meaning of sec. 409; and that even if the dock should be considered a "vessel" or "other craft", it was deliberately or intentionally grounded, and that in such a case the owner is not relieved from personal liability.

The relevant statutes are set out in note 1 below. They were all included in the Rivers and Harbors Appropriation

1. 33 U.S.C.A. § 403 is as follows:

"§ 403. Ostruction of navigable waters generally; wharves; piers, etc.; excavations and filling in

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. Mar. 3, 1899, c. 425, § 10, 30 Stat. 1151."

33 U.S.C.A. § 406 provides as follows:

"§ 406. Penalty for wrongful construction of bridges, piers, etc.; removal of structures

"Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court.

And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States. Mar. 3, 1899, c. 425, § 12, 30 Stat. 1151; Feb. 20, 1900, c. 23, § 2, 31 Stat. 32; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167."

33 U.S.C.A. § 409 states the following:

"§ 409. Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418,

Act of 1899, 30 Stat. 1151, now codified as part of Chapter 9 of Title 33, U.S. Code.

### Historical Facts

Some of the facts have been stipulated. Other historical facts must be found from the testimony, which is conflicting or unclear on many points, and from the records of the parties and witnesses, which are often meager. In drawing inferences and in finding the ultimate facts, the Court has been aided in varying degrees by the expert knowledge and opinion of the witnesses called by the several parties.[2] It is unnecessary to set out in detail all of the incidents and other facts related by the several witnesses. The following summary will suffice.

The dry dock was built around 1920 by Crandall Engineering Company. It was of wooden construction, 360 feet long, had a capacity of 9,400 tons, and was composed of six trussed sections connected by steel pins. The pontoon of each section had a center-line bulkhead and a transverse bulkhead, forming four compartments in each pontoon.

In 1930 Bethlehem purchased the dock for $345,000, and towed it from Charleston, S. C., to Bethlehem's Key Highway Yard in Baltimore, Md., each section of the dock being towed separately.

The six sections comprising the dry dock at the time of the casualty are referred to as Nos. 1, 2, 3, 4, 5 and 7. An additional section had been inserted between the No. 5 and No. 7 sections in 1950, but was removed before the tow. No. 1 was the nearest section to the shore when the dock was in operation.

The dock itself was last dry-docked for inspection and maintenance in 1949. The seams were either rewedged or the existing wedges were driven up. The pontoon timbers were found to be in excellent condition and no renewals were

and 502 of this title. Mar. 3, 1899, c. 425, § 15, 30 Stat. 1152."

33 U.S.C.A. § 414 provides the following:

"§ 414. Removal by Secretary of the Army of sunken water craft generally

"Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: * * * *Provided further*, That any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph shall be covered into the Treasury of the United States. Mar. 3, 1899, c. 425, § 19, 30 Stat. 1154."

33 U.S.C.A. § 415 provides as follows:

"415. Summary removal of water craft obstructing navigation

"Under emergency, * * * the Secretary of the Army or any such agent shall have the right to take immediate possession of such boat, vessel, or other water craft, or raft, so far as to remove or to destroy it and to clear immediately the canal, lock, or navigable waters aforesaid of the obstruction thereby caused, * * * *And provided further*, That the expense of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States. Mar. 3, 1899, c. 425, §. 20, 30 Stat. 1154."

2. There are three concerns in the United States which specialize in dry dock design. The government called an expert witness from one of these concerns and Bethlehem from another. The testimony of the government expert was limited to a few points; the testimony of Bethlehem's expert was not persuasive. The government called a marine surveyor, an impressive witness, whose opinions, through no fault of his own, were based upon assumptions of fact which were later disproved by evidence subsequently offered. Helpful expert testimony was also offered by Bethlehem's employees.

required. Thereafter, the dry dock was in continuous use by Bethlehem until October 4, 1962.

Two inspections were made in 1955 and 1961 to determine the lifting capacity of the dock. In 1961 the employees of the contractor who made the inspection entered only the pontoons of the No. 1, No. 3 and No. 6 sections. A leak was found in the No. 1 pontoon, which was repaired.

During 1962 Bethlehem closed some of its yards in the New York Harbor, making surplus several large dry docks, and decided to replace the 9,400 ton dock at the Key Highway Yard with a 20,000 ton dock from New York. Bethlehem decided that the cheapest way to dispose of the 9,400 ton dock would be to have it towed out of Baltimore Harbor, down the Chesapeake Bay, through the Capes, and out to sea, so that it could be sunk beyond the 1,000 fathom curve. The dock might have been dismantled, dried and burned, or beached and burned on some property in or near the Patapsco River owned by Bethlehem or which could have been purchased or leased by Bethlehem for that purpose.

Bethlehem entered into a written contract with Moran for the towing of the dry dock to a point beyond the 1,000 fathom curve, at a total cost to Bethlehem of some $10,000. Moran undertook the contract upon Bethlehem's assurance that the dry dock was fit for the tow and on the condition that Bethlehem would indemnify Moran against any liability arising out of the unseaworthiness of the tow. Moran and Bethlehem arranged that the operation would be begun on or about October 17, 1962, provided weather conditions in the Bay were favorable, and Moran arranged to have the tow made by Curtis Bay, one of its wholly-owned subsidiaries.[3]

Prior to the towage, Bethlehem removed all keel and bilge blocks and other equipment, including the pumps which had been used in the operation of the dry dock and which were run on current supplied from the shore. Four openings, each approximately one foot square, were cut in the deck of each pontoon, one in each of the water-tight compartments, for the insertion of portable pump suction hose. The holes were placed in the center of each section, so that one portable pump could be used to dewater all four compartments of a section without being moved. Bethlehem placed aboard the dry dock three portable gasoline pumps, each of which had a capacity of 250 gallons per minute. A Bethlehem employee, John F. Walker, made a cursory inspection of the several compartments to determine whether there was any leakage. He found no leakage beyond the customary leakage or seepage, which could be handled by one pump. Neither Walker nor anyone else went into the pontoons to examine the condition of the boards and the wedges and to determine whether or not there were any conditions which might cause trouble during a towing operation.

Particularly, no one remembered that a 12 inch by 12 inch opening in the No. 5 pontoon which had originally provided a pumping outlet had been plugged by two wooden blocks. No one checked to see whether those blocks were firmly in place, able to withstand the particular stresses, tensions and strains involved in a towing operation.

Bethlehem had had some experience in towing dry docks, as a unit and in separate sections. It knew or should have known that when a dry dock is being towed as a unit the foremost section is subjected to the greatest pressure because it moves against a hill of water, which is itself in continuous motion. It knew or should have known that the aftermost section would also from time to time be subjected to greater strains than the center sections, and that leaks in the two end sections would be more

3. In all material matters, the Curtis Bay employees acted under orders from Bethlehem and Moran. Although Curtis Bay was originally made a respondent herein, the government is not now asking for judgment against it.

dangerous to the dock than leaks in other sections, because an end section would not have pontoons on both sides to support it.

Bethlehem knew or should have known that the end sections were subjected to special stresses during the normal operations of the dock, because the weight of the ships on the center sections is distributed by use of bilge blocks, and that the pontoons in the No. 1 section had been found to be leaking at the time of the 1961 inspection. Bethlehem knew that the No. 7 section would be the lead section during the tow. No one had entered the pontoons in the No. 7 section in 1961, and the Court cannot find from credible evidence that any adequate inspection of the pontoons in the No. 7 section had been made in 1955 or at any other time since 1949.

On October 17, 1962, the tug Lambert Point tied on to the No. 7 section and took the dry dock in tow from the Key Highway Yard, with the tug Tern assisting at the after end of the dry dock. Captain Cudworth of the Lambert Point was in charge of the operation.

Bethlehem had designated Walker to ride the tow, to check periodically the water level in each of the compartments, and to use the three portable pumps if necessary. The portable pumps could be shifted from section to section and operated by Walker alone. When Walker was not riding on the dry dock, he rode on the Tern.

Smooth seas and moderate northeasterly winds prevailed throughout October 17 and 18. The tugs and tow passed Sandy Point lighthouse and reached the vicinity of Baltimore light, north of the Chesapeake Bay Bridge, at 2:00 a. m. on October 18. The pontoons of the dry dock had maintained at least six feet of freeboard from the time it left Key Highway, and it was drawing about eight to ten feet. Walker had taken soundings and found the water level in all compartments to be normal. From 2:00 a. m. until after 6:30 a. m., the tugs and dry dock were lying-to west of the channel, making less than one knot, just

enough to offset the tide. At 5:30 a. m., Captain Cudworth looked at the dock and it appeared to him to be normal. At 5:45 a. m. he noticed for the first time that the dock was listing to port at the fore end of the No. 7 section. He called Walker's attention to the listing, but Walker finished his breakfast and did not go onto the dry dock until about 6:15 a. m. He found the foremost port compartment of the No. 7 pontoon to be filling rapidly with swirling water, but testified that he found the normal amount of water in the No. 5 pontoon. He placed one or more pumps on the No. 5 pontoon, but about 7:00 a. m. he found that No. 5 was filling so rapidly that he concentrated on No. 4 and No. 3. Meanwhile, Captain Cudworth decided that the dry dock should be brought back to Key Highway if possible, and communicated this conclusion to Moran and Bethlehem, who approved the decision. About 6:50 a. m. the Lambert Point was transferred to the No. 1 section and began the return trip.

The aft starboard (port on the trip down) end of the No. 7 pontoon continued to sink, and as the tug and tow entered the Baltimore Harbor through Brewerton Channel it appeared to be bumping the bottom from time to time.

By that time, two Bethlehem Steel employees had come down the river in a launch and, after they had discussed the situation with Captain Cudworth, directed him to leave the channel and aim for the southwest corner of Sparrows Point in order to ground the dry dock north of Brewerton Channel. The dry dock grounded in 21 feet of water, some 250 yards north of Brewerton Channel.

### Ultimate Facts

Bethlehem deliberately decided to dispose of the dry dock in the cheapest way —by having it towed out of the harbor, down the Bay, through the Capes, and out to sea, so that it could be sunk beyond the 1,000 fathom curve.

Bethlehem assured Moran of the fitness of the dry dock without having made such an inspection as a reasonably

prudent man would have made to determine whether or not the dry dock was in a reasonably fit condition for the proposed tow. Moran knew or should have known that Bethlehem had not made such an inspection. The inspection need not have been so careful as would have been required if the intention had been to move the dry dock to another location and have it arrive there in operating condition. The inspection should have been sufficiently thorough to determine whether the dry dock was in a condition which made it reasonably prudent to undertake a trip down the Bay and through the Capes in order to sink the dry dock in the ocean. It is impossible to tell what a proper inspection would have shown, but since the dry dock developed a serious leak in the No. 7 pontoon from some unknown cause while the dry dock was lying-to in ideal weather, the Court infers that the dry dock was not in a condition to undertake the trip at the time the tow was begun.[4]

Thereafter the dry dock developed a severe leak in the No. 5 pontoon because the dry dock was not in reasonably fit condition to be towed down the Bay. The Court does not specifically find that the two wooden blocks constituting the plug in the 12 inch by 12 inch hole in the side of the No. 5 pontoon near the bottom came out before the grounding of the dry dock. On the other hand, the Court does not believe all of the testimony of Bethlehem's witnesses with respect to the amount of water in the No. 5 pontoon at various times, and for one reason or another does not accept as sound all the conclusions of any of the experts with respect to the No. 5 pontoon.

Both the condition of the No. 7 pontoon and the fact that the No. 5 pontoon was not in a condition to stand the strains created by the sinking of the No. 7 pontoon were contributing proximate causes preventing the completion of the tow down the Bay and requiring that the dry dock be grounded before it could be returned to the Key Highway Yard.

Aside from the failure to make an adequate inspection before undertaking the tow, respondents' employees were not negligent during the tow until the leak in the No. 7 pontoon was discovered. Thereafter, Bethlehem's employee was negligent in not going more promptly onto the dry dock and starting the pumps, and he and the master of the tug in charge of the operation were negligent in not asking for and in not making the tug's pumps available for use on the several pontoons of the dry dock. However, since the Court finds that the dry dock could not have either completed a journey down the Bay or back to the Key Highway Yard after the two compartments[5] of the No. 7 pontoon and the two corresponding compartments of the No. 5 pontoon had filled with water, the negligence of those two men was not a proximate cause preventing the completion of the tow and requiring the grounding.

The decision to attempt to return the dry dock to the Key Highway Yard rather than to sink it in the Bay or to attempt to tow it through the Capes involved the deliberate assumption of a serious risk of the dry dock grounding in the waters of Baltimore Harbor, but

4. Such an inference is supported by analogy by such cases as Frederick Snare Corp. v. Moran Towing & Transportation Co., S.D.N.Y., 195 F.Supp. 639 (1961), and The Radnor, D.Md., 21 F.2d 982 (1927), which hold that a tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled. See also the Lizzie M. Walker, 4 Cir., 3 F.2d 921 (1925); Cur-

tis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33 (1952). This Court is not basing liability in this case on negligence as such, but these circumstances should be considered in connection with the question discussed in note 7, below.

5. Located on the port side on the trip down, on the starboard side on the trip back.

was a reasonable choice of evils under the circumstances then existing.

The decision to ground the dry dock at the point where it was grounded was intentional, but was a reasonable choice of evils under the circumstances.

### Discussion

The Supreme Court held in Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888), that there is no federal common law prohibiting an obstruction to a navigable stream. Shortly thereafter, Congress passed the Rivers and Harbors Act of 1890, 26 Stat. 454, which was replaced by the Act of March 3, 1899, 30 Stat. 1151, 33 U.S.C.A. § 401 et seq. The material portions of the Act of 1899 are set out in note 1, above. It will be most helpful first to analyze the several statutes and the opinions construing them, then to apply to the facts of this case the principles determined by such analysis.

Sec. 10 of the Act of 1899, now 33 U.S.C.A. § 403, states: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; * * *." Sec. 12, now 33 U.S.C.A. § 406, makes a violation of that provision a misdemeanor; it further provides that "the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

In United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed. 2d 903 (1960), the Court held that the term "obstruction" in the first clause of sec. 403, quoted above, is not limited to the obstructions enumerated in the second and third clauses (see note 1). It also held that the government might obtain relief against such an "obstruction" by an injunction ordering its removal, although sec. 12 of the Act of 1899, now

33 U.S.C.A. § 406, expressly authorizes an injunction only for the removal of "structures". The majority said:

"The void which was left by Willamette Iron Bridge Co. v. Hatch, supra, need not be filled by detailed codes which provide for every contingency. Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences." 362 U.S. at 492, 80 S.Ct. at 890.

In United States v. Perma Paving Co., 2 Cir., 332 F.2d 754 (1964), the Court ruled that the government is not required to seek an injunction directing the guilty party to remove such an obstruction, but may perform the work itself and collect as damages the cost of such removal.

It has not yet been authoritatively decided whether the principles stated and applied in the Republic Steel and Perma Paving cases also apply to vessels and other craft which have been voluntarily or carelessly sunk in navigable waters.

In United States v. Hall, 1 Cir., 63 F. 472 (1894), it was held that the voluntary sinking of a vessel in navigable waters amounted to the creation of an obstruction within the meaning of sec. 10 of the Rivers and Harbors Act of 1890, which was essentially the same as sec. 10 of the 1899 Act, now 33 U.S.C.A. § 403. The Court said:

"Some obligation rests upon the government to keep the harbors clear for public use, and the obligation rests upon each individual member of the public, exercising the right of navigation, to have reasonable regard for public rights, as well as the common and equal rights of others having occasion to use the public waters. In other words, he must not act with reference to his own pecuniary advantage alone. While members of the public may use the harbor as a place of refuge and greater safety for the vessel and cargo in case of necessity and dis-

tress, they may not, under the circumstances disclosed by the record in this case, use it as a scuttling place for the hull, that the rigging may be saved. As has been said, such is not a right incident to the right of navigation; and if, under such circumstances, the owner sees fit to scuttle his vessel, that the wreck may be stripped, he is bound to remove the obstruction, which, for his own slight pecuniary advantage, he voluntarily creates.

"In our view, section 10 of the act of September 19, 1890, was intended to apply to all obstructions of a permanent character not affirmatively authorized by law, willfully, wantonly, carelessly, or voluntarily created in the navigable waters, over which the United States has jurisdiction, not covered by the specific provisions of the preceding sections in the same chapter; and it follows from this construction that hulls of vessels sunk in harbors not through perils of the sea, but by voluntary act of owners or their authorized agents, are obstructions, within the meaning of this section of the statute. It is not quite clear whether the court below, holding this view of the statute, determined the cause, and dismissed the bill upon findings of fact against the government, or whether the order of dismissal resulted from construing the statute as not covering obstructions of the character disclosed by the record; but this is perhaps immaterial, for in either view it results that the decree of the circuit court must be reversed."

Respondents contend, however: (1) that the abandonment and removal of sunken vessels, rafts and other craft are now covered by the provisions of the so-called Wreck Act, 33 U.S.C.A. § 409 et seq., and have been removed from the ambit of sec. 403, whether such vessels are (a) accidentally, (b) carelessly or (c) voluntarily sunk; (2) that the in rem liability provided for in secs. 414 and 415 is exclusive of any in personam liability on the owner to pay for the cost of removal; and (3) that a floating dry dock which is being towed out to sea to be sunk is a "vessel" or "other craft" within the meaning of sec. 409.

█ (1), (2) Where vessels are either (a) accidentally or (b) negligently (carelessly) sunk, the clear weight of authority holds that the Wreck Act applies, and that secs. 409, 414 and 415 permit the owner to abandon the vessel, and limit liability for the costs of its removal to liability in rem against the vessel and her cargo. In re Eastern Transportation Co., D.Md., 102 F.Supp. 913 (1952), aff'd sub nom. Ottenheimer v. Whitaker, 4 Cir., 198 F.2d 289 (1952); United States v. Zubik, 3 Cir., 295 F.2d 53 (1961); United States v. Bethlehem Steel Corp. (The Texmar), 9 Cir., 319 F.2d 512 (1963); United States v. Cargo Salvage Corp., S.D.N.Y., 228 F.Supp. 145 (1964). See also United States v. Bridgeport Towing Line, Inc., D.Conn., 15 F.2d 240 (1926).

No case since Hall has dealt with a vessel which was (c) voluntarily sunk. Judge Madden, in his opinion in the Bethlehem Steel (Texmar) case made it clear that he was not dealing with a situation where a vessel had been voluntarily sunk. He said:

"It would not be impertinent to inquire what should be done in the case of an owner who has intentionally scuttled his ship, and thus obstructed a channel. The statutes are as silent about this situation as they are about innocently or negligently created obstructions. In United States v. Hall, 63 F. 472 (Cir. 1), a mandatory injunction was granted compelling the owner, in such a case, to remove the wreck. Obviously the court in such a case would be powerfully impelled toward requiring the owner to remedy his inexcusable wrong. It was the kind of extraordinary case which does not have great value as a precedent. At any rate it has not influenced the courts in the several cases which we have

cited, involving, as our case does, negligent sinkings of ships." 319 F.2d at 520.

In his dissenting opinion in that case, Judge Browning suggested that recovery in personam against the owners is permitted under the Wreck Act, secs. 409, 414 and 415, by analogy to the provisions of secs. 403 and 406, "whether the sinking is caused deliberately 'or carelessly.'" 319 F.2d 522, 524.

In the Perma Paving case, supra, which dealt with a claim by the government under secs. 403 and 406, and not the Wreck statute, the Court noted that in the Zubik and Bethlehem Steel (Texmar) cases the Third Circuit and the Ninth Circuit had refused to allow the United States to recover damages for the removal of a wrecked ship which the owner had abandoned. Judge Friendly said:

"We need not determine whether if that precise issue should arise in this circuit, we would follow those decisions or Judge Browning's dissent in the Bethehem case. It is enough here that the detailed provisions with respect to wrecked vessels contained in 33 U.S.C. §§ 409, 411, 412, 414 and 415, afford a far stronger basis for immunizing the owners of wrecked vessels from in personam liability for the costs of removal than any of the statutes relevant to this case." 332 F.2d at 758.

In the Bridgeport Towing Line case, supra, where the government sought to impose personal liability on the owner under what is now secs. 403 and 406 for the negligent sinking of a vessel, the judge referred to the Hall case, supra, and said:

"* * * It seems to me, however, that the deliberate scuttling of a vessel at a point where she would constitute an obstruction to navigation comes precisely within the definition of the word 'creation,' as I have hitherto defined it. In other words, wholly irrespective of whether or not there was a design to create an obstruction to navigation, the result of the consciously directed sinking of the ship at the spot in question should reasonably have been apprehended, and therefore it is to be assumed that the creation of the obstruction was intended. The differentiating circumstance in the present case, however, lies in the fact that the sinking of the vessel was not deliberate, was not intended, but was due to an accident which, whether caused by negligence or not, remains nevertheless an accident.

"I am therefore of the opinion, and so hold, that the stipulated facts do not bring the case within the scope of the provisions of the statute relied upon by the government. * * *" 15 F.2d at 241.

In the Eastern Transportation Co. case, supra, Judge Coleman held that sec. 409 permits abandonment of a vessel only as a result of such things as fire, storm, collision or unforeseen unseaworthiness; and that a trustee in bankruptcy, in order to save expense, could not deliberately abandon and allow obsolescent barges to sink in navigable waters, but was required to remove the barges under the direction of the United States District Engineer and Harbor Engineer of Baltimore City at the cost of the bankrupt estate. The Fourth Circuit affirmed in a relatively brief opinion.

(3) The discussion up to this point has dealt with vessels. Before applying the foregoing principles to the facts of this case, we must consider whether a floating dry dock is a "vessel" or "other craft", within the meaning of sec. 409, or becomes a vessel or other craft when it is towed to sea to be sunk.

The word "vessel" ordinarily refers to a structure made to float upon the water for navigation, a craft for navigating the water, usually one larger than a common rowboat. A "craft" is defined as a vessel of any sort. The term vessel is defined in 33 U.S.C.A. § 144(c) (i), for the purposes of the International Rules for Navigation at Sea, as follows: "the

word 'vessel' includes every description of water craft, other than a seaplane on the water, used or capable of being used as a means of transportation on water". Literally, the dock with which we are dealing may have been capable of being used as a means of carrying a man or some goods; a Bethlehem employee rode on it part of the way in order to tend the pumps; but the dock was not intended nor adapted for the transportation of either persons or cargo, in its ordinary use or in its final trip to the graveyard. In Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887), the Supreme Court held that a floating dry dock, permanently moored, was not a ship or a vessel subject to salvage service. Whether such a dock becomes a "vessel" or "other craft" entitled to the benefits of sec. 409, if and when it is towed out of the harbor to be sunk in the ocean, depends, of course, upon the purpose and intent of Congress in adopting the various statutes under discussion.

■ Unfortunately, as Judge Feinberg noted in the Cargo Salvage Corp. case, 228 F.Supp. at 150, 151, "the legislative history is meager." [6] The apparent purpose of the statute is to protect the owners of small and large vessels from the additional expense of removing the wreck after they have had the misfortune of losing their boat or their ship. For a discussion of this purpose, see the opinions of Judge Madden and Judge Duniway in the Bethlehem Steel (Texmar) case, 319 F.2d at 518 and 522.

■ This Court concludes that a floating dry dock is not a "vessel" or "other craft" within the purview of sec. 409, but that the case is controlled by secs. 403 and 406. This conclusion makes it unnecessary to discuss at length the questions raised by the dissent of Judge Browning in the Bethlehem Steel (Texmar) case and the caveat of Judge Friendly at the end of the Court's opinion in the Perma Paving case.[7]

*Conclusion*

(1) The government is entitled to a decree directing Bethlehem and Moran to remove the obstruction within a reasonable time, or to pay to the government the reasonable cost of such removal by the government; and

---

6. See generally Koonce, Federal Laws Affecting River & Harbor Works, speech given at the Engineer School, Fort Humphreys, Virginia (April 23, 1926), attached to Trial Brief of the United States.

7. If it were necessary for the decision of this case, this Court would hold that under sec. 409 a distinction should be made between vessels which are deliberately or voluntarily sunk on the one hand and those which are accidentally or negligently sunk on the other. As stated above, the statutes and the weight of authority indicate that Congress intended to protect the owners of vessels from personal liability for the expense of removing the wreck after they have had the misfortune of losing their boat or their ship; that consideration does not apply to an owner who voluntarily scuttles his vessel. If sec. 409 should be construed to remove all vessels and other craft from the ambit of sec. 403, sec. 409 itself, when considered in the light of its purpose, should not be construed as absolving from in personam liability an owner who voluntarily scuttles his vessel.

It follows that if the floating dry dock in this case were held to be a "vessel" or "other craft" within the meaning of sec. 409, the application of that section to this case would not be free from difficulty. Bethlehem deliberately decided to sink the dock, and arranged to have it towed out of the harbor, down the Bay and through the Capes for that purpose. It did not originally intend to sink it in the harbor, but when an emergency was brought on as a result of Bethlehem's negligence, Bethlehem and Moran deliberately decided to sink the dock in the harbor (a "navigable channel", as that term is used in sec. 409) for the reasons stated in the findings of fact. The phrase "navigable channel" in sec. 409 is not limited "to those deeper channels marked by buoys and used by large vessels." Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77, at 78. Even if the dock were held to be a "vessel" or "other craft" within the meaning of sec. 409, the Court would find Bethlehem and Moran liable for the costs of removal under the facts of this case.

(2) that, between respondents, in view of their contract, the costs of such removal should be borne by Bethlehem.

Settle an appropriate decree within two weeks.