UNITED STATES of America

v.

BETHLEHEM STEEL CO., and Moran Towing Corp. and Transportation Company, Inc.

Adm. No. 4599.

United States District Court
D. Maryland.

July 31, 1969.

Thomas F. McGovern, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff.

David R. Owen, Baltimore, Md., for Bethlehem Steel Co.

William A. Grimes, Baltimore, Md., for Moran Towing Corp.

THOMSEN, Chief Judge.

The judicial history and background of this case may be found in opinions reported in 235 F.Supp. 569 (D.Md.1964), 374 F.2d 656 (4 Cir. 1967), 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968), and 409 F.2d 961 (4 Cir. 1969), the first and third sub nom. United States v. Bethlehem Steel Co. et al., the second and fourth sub nom. United States v. Moran Towing & Transp. Co., et al.

In its recent decision, 409 F.2d 961, the Fourth Circuit vacated the earlier findings and remanded the case for further proceedings consistent with the majority opinion there reported and the Supreme Court's remand—in essence, directing this Court to receive such additional evidence as either side might wish to offer, and to make findings of fact and conclusions of law on the issues of negligence and proximate cause upon the existing record and such new evidence.

Pursuant thereto, this Court has held an additional hearing, at which both the government and Bethlehem offered evidence, and counsel have presented their arguments. The government conceded that it had proved no case against Moran, and judgment will be entered for that defendant.

All of the previous findings of fact have been reexamined. The present findings are based upon the agreed facts, the transcript of testimony and the exhibits offered at the previous trial, and the testimony and exhibits offered at the recent hearing. In making the findings set out below, the Court has considered the credibility of the several witnesses, in accordance with accepted principles.

The dry dock was built in 1917 by Crandall Engineering Company. It was of wooden construction 360 feet long, had a capacity of 9,400 tons, and was composed of six trussed sections connected by steel pins. Each section was shaped thus— ⊔ —with its sidewalls rising at right angles from its pontoon, and the outside of each sidewall running down to the bottom of the pontoon. The pontoon of each section had a centerline bulkhead and a transverse bulkhead, forming four compartments in each pontoon.

Bethlehem purchased the dock in 1930, and it was then towed from Charleston, S. C., to Bethlehem's Key Highway Yard in Baltimore. Each section of the dock was towed separately.

The six sections comprising the dry dock at the time of the casualty are referred to as Nos. 1, 2, 3, 4, 5, and 7. An additional section had been inserted between the No. 5 and No. 7 sections in 1950, but was removed before the tow. In some of the testimony and exhibits the No. 7 section is referred to as No. 6. The No. 6 section which was added and removed before the tow has no importance in this case. No. 1 was the nearest section to the shore when the dock was in operation. No. 7 was the foremost section during the trip down the river and the bay on October 17–18, 1962, with which we are concerned in this case; No. 1 was the foremost section on the trip back up the bay.

The dry dock itself was last dry-docked for inspection and maintenance in 1949.

The seams were either rewedged or the existing wedges were driven up. The pontoon timbers were found to be in excellent condition and no renewals were required. Thereafter, the dry dock was in substantially continuous use by Bethlehem until October 4, 1962. During 1949 and 1950 Bethlehem equipped each of the six sections with wooden sponsons or blisters to add stability.

Inspections were made in 1956 and 1961 to determine the lifting capacity of the dock. In 1956 each of the pontoons, including the interior portion, was inspected. The 1956 report stated that the structural timber framing and planking was sound and in good condition. In 1961 the inspectors entered only the pontoons of the No. 1, No. 3 and No. 6 sections. Excessive leaking was found in the No. 1 pontoon, which was repaired. Otherwise, the framing and planking in the pontoons which were inspected were found to be sound and in good condition.

During 1962 Bethlehem decided to replace the 9,400 ton dock at the Key Highway Yard with a 20,000 ton dock from New York. Having no use for the 9,400 ton dock and being unwilling to sell it to a competitor, Bethlehem considered how to dispose of it. Bethlehem contemplated beaching the dry dock and burning it, but the landowners it contacted were unwilling to have their properties used for that purpose. An inquiry was addressed to the Maryland Port Authority, which declined to approve sinking the dock anywhere in the Chesapeake Bay, but, after suggesting the possibility of beaching and burning it, mentioned that it might be sunk at sea. Bethlehem decided that the cheapest way to dispose of the 9,400 ton dock would be to have it towed as a unit out of Baltimore Harbor, down the Chesapeake Bay, through the Capes, and out to sea, so that it could be sunk beyond the 1,000 fathom curve.

Bethlehem contracted with Moran to tow the dry dock to a point beyond the 1,000 fathom curve, at a total cost to Bethlehem of some $10,000. Moran undertook the contract upon Bethlehem's assurance that the dry dock was fit for the tow and on the condition that Bethlehem would indemnify Moran against any liability arising out of the unseaworthiness of the tow.

Moran and Bethlehem arranged that the operation would be begun on or about October 17, 1962, provided weather conditions in the Bay were favorable.

Prior to the tow, Bethlehem removed all keel and bilge blocks and other equipment, and disconnected the 24 pumps on the dry dock, each of which had a capacity of 4,000 gallons per minute, but which were inoperable without shore power. Four openings, each approximately one foot square, were cut in the deck of each pontoon, one in each of the water-tight compartments, for the insertion of portable pump suction hose. Bethlehem placed aboard the dry dock three portable gasoline pumps, each of which had a capacity of 250 gallons per minute.

During the period between the last use of the 9,400 ton dock on October 4 and October 11, while the dock remained moored at the Key Highway Yard, Bethlehem conducted a test of the leaking in the pontoons, but found no leakage beyond the customary leakage or seepage, which could be handled by one pump. No one went into the pontoons to examine the condition of the boards and the wedges,[1] and to determine whether or not there were any conditions which might cause trouble during a towing operation. Particularly, no one remembered that a 12 inch by 12 inch opening in each pontoon (which had originally provided a pumping outlet shown on blue prints then available) had been plugged by two wooden blocks, which were covered by non-watertight sheathing on the outside and by mud and silt on the inside, without other support. No one checked to see whether those blocks were firmly in

1. Wedges had been driven—some from the outside and some from the inside—to prevent leaking during the normal operation of the dry dock.

place, able to withstand the particular stresses, tensions and strains involved in a towing operation.

No one examined the sides or bottom of the pontoons below the waterline. Sheathing on the outside of each pontoon provided some support for the wedges and for the two blocks which had been inserted to plug the holes in each pontoon, where the old pumping outlets had been, but many of the nails which held the sheathing were rusty and deteriorated.

On October 17, 1962, the tug Lambert Point tied on to the No. 7 section and took the dry dock in tow from the Key Highway Yard, with the tug Tern assisting at the after end of the dry dock. Captain Cudworth of the Lambert Point was in charge of the operation.

Bethlehem had designated John Walker, one of its employees, to ride the tow, to check periodically the water level in each of the compartments, and to use the three portable pumps if necessary. The portable pumps could be shifted from section to section and operated by Walker alone. When Walker was not riding on the dry dock, he rode on the Tern.

Smooth seas and moderate northwesterly winds prevailed throughout October 17 and 18. The tugs and tow passed Sandy Point lighthouse and reached the vicinity of Baltimore light, north of the Chesapeake Bay Bridge, at 12:20 a. m. on October 18. They had been making four or five knots. The pontoons of the dry dock had maintained at least six feet of freeboard from the time it left Key Highway, and it was drawing about eight to ten feet. Walker had taken soundings and found the water level in all compartments to be normal. From 12:20 a. m. until after 6:30 a. m., the tugs and dry dock were lying-to west of the channel, making less than one knot, just enough to offset the tide. At 5:30 a. m., Captain Cudworth looked at the dock and it ap-

peared to him to be normal. At 5:45 a. m. he noticed for the first time that the dock was listing to port at the fore end of the No. 7 section. He called Walker's attention to the listing, but Walker finished his breakfast and did not go onto the dry dock until about 6:15 a. m. He found the foremost port compartment of the No. 7 pontoon to be filling rapidly with swirling water, but testified that he found the normal amount of water in the No. 5 pontoon. He placed one or more pumps on the No. 5 pontoon, but about 7:00 a. m. he found the No. 5 was filling so rapidly that he concentrated on No. 4 and No. 3. Meanwhile, Captain Cudworth decided that the dry dock should be brought back to Key Highway if possible, and communicated this conclusion to Moran and Bethlehem, who approved the decision. About 6:50 a. m. the Lambert Point was transferred to the No. 1 section and began the return trip.

The aft starboard (port on the trip down) end of the No. 7 pontoon continued to sink, and as the tug and tow entered the Baltimore Harbor through Brewerton Channel it appeared to be bumping the bottom from time to time.

By that time, two Bethlehem Steel employees had come down the river in a launch and, after they had discussed the situation with Captain Cudworth, directed him to leave the channel and aim for the southwest corner of Sparrows Point in order to ground the dry dock north of Brewerton Channel. The dry dock grounded in 21 feet of water, some 250 yards north of Brewerton Channel.

After the grounding, a diver employed by the government discovered that the sheathing supporting the blocks in the No. 5 pontoon had washed away and that the blocks had fallen into the interior of that pontoon.[2] Various factors, including the depth and dirty

2. Whether those blocks fell into No. 5 pontoon before, at or after the grounding at Sparrows Point is not clear, but they

fell in after No. 7 pontoon had filled with water.

character of the water in and around No. 7 pontoon prevented an adequate examination of that pontoon. The diver found no broken boards on the sides of any pontoon, nor on any part of the bottom that he could feel. Most of the sheathing was still in place.

Photographs taken by a chief carpenter in the Coast Guard, who inspected the dock shortly after it was grounded, show that many of the timbers in the sidewalls of section 7[3] and two other sections had rotted and deteriorated to such an extent that the structural rigidity which the sidewalls gave to the pontoons was diminished. The water in the pontoons prevented their examination. The Court finds, however, that the timbers in the pontoons, which had been floating and periodically submerged in brackish water in the Baltimore Harbor for many years, had not rotted or deteriorated to any considerable extent, but some of the nails and spikes had rusted.

There is no evidence that any outside force, such as a submerged log or other object, ruptured the side or bottom of No. 7 pontoon either during the trip down the river and bay or while the flotilla was stemming the tide during the early hours of October 18. The government diver found no such damage to any of the boards. The diver employed by Bethlehem was not called as a witness. If any such collision had taken place shortly before 5:45 a. m. when Captain Cudworth noticed the list in the No. 7 section (after having noted no such list at 5:30 a. m.), Captain Cudworth, who was on the lead tug Lambert Point, would probably have felt a tremor.

The fact that the foremost port compartment of the No. 7 pontoon was filling rapidly with swirling water before any appreciable amount of water was discovered in any of the other pontoons, supports if it does not require the inference, which the Court draws, that the flooding of the No. 7 pontoon was caused by a substantial opening therein, as a result either (a) of one or both of the blocks working loose from the sheathing and falling inside the pontoon, or (b) one or more of the bottom boards working open.

Before the beginning of the tow, Bethlehem did not adequately consider the stresses, tensions and strains to which the dry dock would be subjected during the tow. Bethlehem had had some experience in towing dry docks, although it does not appear that it had ever towed as a unit a sectional dock such as the one involved in this case. If its civil and mechanical engineers and other responsible employees did not know how serious the stresses, tensions and strains during the tow would be, they could have engaged a consulting marine engineer, as they had done before they towed another dock (in sections) from the east to the west coast, or could have consulted marine engineers in the shipbuilding division of their own company.

Although in its normal operations the dock had been subjected to stresses, tensions and strains of greater intensity than those to which it was subjected during the tow, they were applied differently. There was less danger that the timbers would *break* during the tow than during normal operations, but greater danger that the boards would *"work"* during the tow in such a way as to create (a) a serious danger of some of the wedges working loose, thus opening one or more of the seams in the sides or the bottom of the end pontoons and permitting one of the boards to work loose, and (b) a serious danger of the small blocks working loose and falling into the pontoon.

Bethlehem knew or should have known that many of the stresses, tensions and strains to which the tow would be subjected would be much greater if the dock were towed as a unit than if each section were towed separately. Bethlehem also knew or should have known that when a dry dock is being towed as a unit the foremost section is subjected

3. Referred to as Section 6 on the photographs.

to great pressure because it moves against a hill of water, which is itself in continuous motion. It knew or should have known that leaks in either of the two end sections would be more dangerous to the dock than leaks in other sections, because an end section would not have pontoons fore and aft to support it.

Bethlehem knew or should have known that the end sections had been subjected to special stresses during the normal operations of the dock, because the weight of ships on the center sections is distributed by the use of bilge blocks. It knew that the pontoons in the No. 1 section had been found to be leaking at the time of the 1961 inspection. Bethlehem also knew that the No. 7 section would be the lead section during the tow. No one had entered the pontoons in the No. 7 section in 1961, and the Court cannot find from credible evidence that any adequate inspection of the pontoons in the No. 7 section had been made for any purpose in 1956 or at any other time since 1949.

Before the beginning of the tow, Bethlehem did not make an adequate inspection to determine if the dry dock was in fit condition to be towed as a unit down the river and the bay.[4] If Bethlehem had made an adequate inspection and had given adequate consideration to the stresses, tensions and strains to which the dry dock, and particularly the foremost section (No. 7) would be subjected during the tow, it would have found at least the presence of the unbraced blocks, attached to the flimsy sheathing by rusty nails, and the deterioration in the wingwalls, which would permit greater working in the boards of the pontoons during a tow. Bethlehem should then have realized that despite the good condition of the pontoon boards, there was (a) a serious danger of the seams opening and a board working loose, and (b) a serious danger that one or more of the blocks would fall into the pontoon. These conditions rendered the dry dock unfit for the tow as a unit.

■ Bethlehem is not entitled to a ruling that as a matter of law the government's case is barred by its failure to prove by direct evidence that the water entered No. 7 pontoon because the two blocks worked out of place or because some other serious opening developed as a result of some condition which Bethlehem should have discovered. Wratchford v. S. J. Groves & Sons Company, 405 F.2d 1061 (4 Cir. 1969). That element of the government's case may be proved by circumstantial as well as direct evidence, and the judge, as the finder of fact, may find from all the evidence that the most probable cause of the presence of a great amount of swirling water in No. 7 pontoon— namely, the working loose of one of the bottom boards or of one of the blocks in that pontoon—was in fact the true and proximate cause. I do so find. Whether one of the bottom boards opened up or one of the blocks fell in, it was a danger which should have been recognized by Bethlehem in the exercise of ordinary care and by the making of a reasonably adequate inspection.[5]

■ The Court finds and concludes that the sinking was proximately caused by negligence on the part of Bethlehem, and that it is liable to the government for $163,000, with interest at the rate of 4% from January 1, 1966, to the date of judgment.

Judgment will be entered accordingly.

---

4. Compare the casual inspection made by Bethlehem with the inspection made by Captain Holm-Anderson of a similar dry dock for similar purposes. Original transcript pp. 87–89.

5. No negligence on the part of the employees of either Bethlehem or Moran *during the tow* was a proximate cause of the sinking.